**IN THE CIRCUIT COURT OF JEFFERSON COUNTY**
**STATE OF MISSOURI**

| | |
|---|---|
| **DAN CREPPS,** *individually and on behalf of all others similarly situated,* | ) ) ) ) ) Case No. 19JE-CC00489 |
| Plaintiffs, | ) ) |
| v. | ) **JURY TRIAL DEMANDED** ) ) |
| **CONOPCO, INC.,** *d/b/a* **"UNILEVER,"** **DOES 1 through 10,** | ) ) ) |
| Defendants. | ) ) |

**FIRST AMENDED CLASS ACTION PETITION**

Plaintiff Dan Crepps, individually and on behalf of all others similarly situated, hereby files this, his First Amended Class Action Petition, against Defendant Conopco, Inc., *d/b/a* "Unilever" and DOES 1 through 10 (collectively "Defendants") for their false, misleading, and deceptive marketing of their products constituting, on a nationwide basis, breach of warranty, breach of implied contract, and unjust enrichment, and, in the state of Missouri, violations of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA").

### I.   INTRODUCTION

1. Defendant Unilever markets and sells many different consumer products, including deodorant and antiperspirant sticks. One such product is "Axe"-branded antiperspirant featuring so-called "Anti Marks Protection."

2. The "Anti Marks Protection" line of Axe antiperspirants is deceptively and misleadingly marketed as having an "Anti Marks Protection" component compared to Axe's non-"Anti Marks Protection" antiperspirant line; yet, in reality, the "Anti-Marks Protection" line of antiperspirant is nothing more than a slightly diluted version of Axe's non-"Anti Marks Protection" antiperspirant

Electronically Filed - Jefferson - July 08, 2019 - 05:05 PM

containing essentially the same ingredients, with no "protective" ingredient added.

3. Compared to Axe's non-"Anti Marks Protection" antiperspirant, "Anti Marks Protection" does not contain addition ingredients that have any "protective" properties; the *only* material difference is that the active ingredient, Aluminum Zirconium Tetrachlorohydrex GLY, is diluted from a concentration of 19% in Axe's non-"Anti Marks Protection" antiperspirants to 11.4% in the "Anti Marks Protection" line of products.

4. Yet even more problematic, it is well-established that the "yellow stains" and "white marks" that the "Anti Marks Protection" line of antiperspirants claims to "protect" from, and/or be "anti" towards, are in fact *created* and *caused by* that very same active ingredient, Aluminum Zirconium Tetrachlorohydrex GLY ("Aluminum").

5. This is borne out under basic testing of the Product; the fact it *absolutely* causes white marks on clothing is readily apparent to any user after purchasing the Product.

6. Thus, in reality, while perhaps doing it to a slightly lesser extent than Axe's non-"Anti Marks Protection" antiperspirant, the "Anti Marks Protection" line of antiperspirants actually *causes* the very problems Unilever deceptively claims it "protects [users] shirts from."

7. In short, while "Anti Marks Protection" is marketed as having "a unique formula *with* anti white marks and yellow stains protection," in reality, it is nothing more than a less-effective version of Axe's non-"Anti Marks Protection" antiperspirant that causes the very problems it claims to solve.

8. Despite all this, and despite being a diluted version thereof, Unilever sells the product for the same price as its non-"Anti Marks Protection" antiperspirant, misleading and deceiving the buying public into paying the same amount for an inferior product while under the false impression that it is somehow superior.

9. Pursuant to the MMPA, such practice is illegal.

10. In addition and/or in the alternative to the above, since the initial offering of the Product,

each and every container of the Product has borne a uniformly-worded label falsely claiming the Product causes and/or produces "No Yellow Stains" and "No White Marks." That uniformly-worded false statement gives rise to additional and/or alternative claims on behalf of a nationwide class of similarly-situated consumers.

## II.     PARTIES, JURISDICTION, AND VENUE

11.     Plaintiff Dan Crepps is a citizen and resident of Jefferson County, Missouri.

12.     Plaintiff brings this First Amended Class Action Petition individually and on behalf of a putative nationwide class of all United States consumers and, additionally or alternatively, a putative class of Missouri residents.

13.     Defendant Conopco, Inc. *d/b/a* "Unilever" (hereinafter "Unilever") is a New York corporation having its principal place of business at 700 Sylvan Ave., Englewood Cliffs, NJ 07632. Unilever may be served at: CT Corporation System, 120 South Central Ave., Clayton MO 63105.

14.     Defendant Unilever advertises, distributes, markets and sells the "Axe"-branded antiperspirant featuring so-called "Anti-Marks Protection."

15.     The true names and capacities of the Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. If necessary, Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

16.     Venue is proper in the Circuit Court of Jefferson County, Missouri, because the Plaintiff resides here, and a substantial part of the events or omissions giving rise to the claims in this action occurred in this venue.

17.     This asserted class action comports with Missouri Supreme Court Rule 52.08 and with R.S.Mo. § 407.025(3) of the MMPA. Plaintiffs' identities can be ascertained from Defendant's records,

but are so numerous that simple joinder of all individuals is impracticable. This action raises questions of law and fact common among Plaintiffs. The claims of lead Plaintiff is typical of all Plaintiffs' claims. Named Plaintiff will fairly and adequately protect all Plaintiffs' interests, and is represented by attorneys qualified to pursue this action. More specifically:

18. <u>Class and Subclass definitions</u>: Plaintiff Dan Crepps brings this action on behalf of himself and a nationwide class of similarly-situated persons preliminarily-[1]defined as follows: All persons who purchased "Axe"-branded antiperspirant featuring so-called "Anti-Marks Protection" (the "Product")[2] during the Class Period in the United States. In addition, and/or alternatively, Plaintiff Dan Crepps brings this action on behalf of himself and a Missouri subclass of similarly-situated persons defined as follows: All persons, who, within the Class Period, purchased the Product in the State of Missouri. The Class Period begins five years prior to the date of the filing of the Original Petition filed in this matter, July 4, 2014, and ceases upon the date of the filing of the Original Petition filed in this matter, July 4, 2019. Excluded from the Class and Subclass are: (a) any judges presiding over this action and members of their staffs and families; (b) the Defendants and their subsidiaries, parents, successors, and predecessors; any entity in which the Defendants or their parents have a controlling interest; and the Defendants' current or former officers and directors; (c) employees (i) who have or had a managerial responsibility on behalf of the organization, (ii) whose act or omission in connection with this matter may be imputed to the organization for liability purposes, or (iii) whose statements may constitute an admission on the part of the Defendants; (d) persons who properly execute and file a timely request for exclusion from the class; (e) the attorneys working on the Plaintiffs' claims; (f) the legal representatives, successors, or assigns of any such excluded persons; and (g) any individual who assisted or supported the wrongful acts delineated herein.

---

[1] Plaintiff reserves the right to propose, as needed, any different or other more- or less-specific class, classes, subclass, or subclasses as Plaintiff deems appropriate for purposes of class certification.

[2] As that term and label is defined in greater detail *infra.*

19. <u>Numerosity</u>: Upon information and belief, the Class and Subclass include tens of thousands, if not hundreds of thousands, of individuals on a nationwide and/or statewide basis, making their individual joinder impracticable. Although the exact number of Class and Subclass members and their addresses are presently unknown to Plaintiff, they are ascertainable from Defendant's records.

20. <u>Typicality</u>: Plaintiff's claims are typical of those of the Class and Subclass because all Plaintiffs were injured by the Defendant's uniform wrongful conduct, specifically, using misleading and deceptive marketing and advertising in offering and selling the Product to Plaintiffs.

21. <u>Adequacy</u>: Plaintiff Dan Crepps is an adequate representative of the Class and/or Subclass because his interests do not conflict with the interests of the Class or Subclass members he seeks to represent, he has retained competent and experienced counsel, and he intends to prosecute this action vigorously. The interests of the Class and Subclass will be protected fairly and adequately by Plaintiff and his counsel.

22. <u>Commonality</u>: Common questions of law and fact exist as to all Class and Subclass members and predominate over any questions affecting only individual members, such as: (a) whether the Defendant used deceptive or misleading marketing and advertising in selling the Product; (b) whether and to what extent the Class and Subclass members were injured by Defendant's illegal conduct; (c) whether the Class and Subclass members are entitled to compensatory damages; (d) whether the Class and Subclass members are entitled to punitive damages; (e) whether the Class and Subclass members are entitled to declaratory relief; and (f) whether the Class and Subclass members are entitled to injunctive relief.

23. <u>Superiority</u>: This class action is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by the individual Class and Subclass members will likely be small relative to the burden and expense of individual prosecution of the complex litigation necessitated by the Defendant's

Electronically Filed - Jefferson - July 08, 2019 - 05:05 PM

wrongful conduct. Thus, it would be extremely difficult for the individual Class and Subclass members to obtain effective relief. A class action presents far fewer management difficulties and provides the benefits of a single adjudication, including economies of time, effort, and expense, and uniformity of decisions.

### III.   BACKGROUND

24.      Defendant manufactures, distributes, and/or sells the product at issue herein, "Axe"-branded antiperspirant featuring so-called "Anti Marks Protection."

25.      Defendant Unilever, in particular, owns the "Axe" brand and, under that brand name, manufactures and distributes, *inter alia,* the "Axe"-branded antiperspirant featuring so-called "Anti-Marks Protection."

26.      The "Anti Marks Protection" line of products is marketed as being superior to "regular" "Axe" antiperspirant purportedly for having, *inter alia,* "a unique formula with anti white marks and yellow stains protection."[3]

27.      As used herein, the term "Product" refers to all varieties of "Axe"-branded antiperspirant featuring so-called "Anti-Marks Protection," including the following scents:

      a.   "Gold Original"

      b.   "Signature Gold"

      c.   "Signature Night"

      d.   "48HR Charge Up Protection"

      e.   "Signature Island"

28.      The ingredients in all varieties of the "Axe"-branded antiperspirant featuring so-called "Anti-Marks Protection" are materially the same, all varieties are marketed and sold in white containers

---

[3] *See, e.g.,* https://www.axe.com/us/en/products/deodorant-antiperspirant/antiperspirant/gold-original-antiperspirant-deodorant-stick.html

(as opposed to black for the "normal" Axe antiperspirant), and all varieties bear the same marketing claims discussed *infra* on their containers; thus, all varieties are substantially similar so as to be treated collectively as the "Product" as that term is hereinafter used in this Petition.

    29.       The Product's container appears as follows, for example (three varieties are shown):



          a.

    30.       As shown, the Product comes in white containers for all varieties, distinguishing the Product from Axe's non-"Anti Marks Protection" line of products.

    31.       Looking more closely at the packaging/container, multiple false claims are made on the container itself:



a.

32.      The front of the container for the Product claims that the Product is "Anti Marks."

33.      In addition, also on the front of the Product, the lid of the container asserts "No Yellow Stains" and "No White Marks."

34.      On the back, the container claims that the Product has "Anti Marks *Protection*" (emphasis added).

35.      Moreover, the back of the container asserts that the Product: "protects your shirts from white marks and yellow stains."

8

36. However, the active ingredient in the Product is Aluminum Zirconium Tetrachlorohydrex GLY. It has long been recognized, and is well-accepted, that "yellow stains" and "white marks" on clothing is *caused* by aluminum in antiperspirants (generally upon being mixed with a user's perspiration).

37. Even worse, when tested by any consumer after purchasing the Product, the fact that the Product *absolutely* leaves white marks on clothing is readily apparent.

38. While the Product might in fact cause *less* staining and/or white marks than Axe's non-"Anti Mark Protection" antiperspirant, the Product will inevitably lead and contribute to more staining on clothing than when it is not used at all.

39. Thus, regardless of the extent it does so, the Product causes, at least indirectly, the exact condition – "white marks" and "yellow stains" that it purports to "protect from" and/or be "anti"-towards.

40. In addition to the fact that Aluminum Zirconium Tetrachlorohydrex GLY actually *causes* yellow staining and that the product clearly creates white marks on clothing, the Product is otherwise completely absent of any ingredient that could be considered capable of "protecting" against stains or marks.

41. Despite Defendant's claiming the Product is "a unique formula with anti white marks and yellow stains protection," compared to the non-"Anti Marks Protection" "Axe" antiperspirant, the Product does not have a single ingredient not contained in at least one variety of the non-"Anti Marks Protection" except for silica.

42. According to Unilever's Axe-branded website, www.axe.com, and confirmed by corresponding product packaging, the Product contains the following ingredients:

   a. Active Ingredient: Aluminum Zirconium Tetrachlorohydrex GLY

   b. Inactive Ingredients:

9

       i. Cyclopentasiloxane, PPG-14 Butyl Ether, Stearyl Alcohol, Polyethylene, Hydrogenated Castor Oil, PEG-8 Distearate, Fragrance (Parfum), Silica, BHT.

43. The *only* additional ingredient in the Product not found in at least one other variety of non-"Anti Marks Protection" Axe antiperspirant is silica.

44. Yet silica is merely added to deodorant to help absorb moisture from sweat; upon information and belief, silica does not provide any "protection" from "yellow stains" and/or white marks; indeed, as to white marks, a simple test of the Product reveals that it *causes* them as opposed to "protecting" against them.

45. Additionally, compared to most varieties of Defendant's non-"Anti Marks Protection" Axe antiperspirant, both talc and isopropyl palmitate are removed; upon information and belief, while the removal of those ingredients might result in a negligible *reduction* of "white marks" compared to non-"Anti Marks Protection" Axe antiperspirant (but certainly not compared to not using the Product at all), the mere omission of certain ingredients certainly would not be considered by any reasonable consumer as adding "protection."

46. In short, there is no ingredient in the Product that provides "protection" from white marks or yellow stains as claimed.

47. Nor is there any ingredient in the Product that could legitimately be considered as rendering the Product "anti white marks" or "anti yellow stains."

48. Merriam- Webster online dictionary defines the word "anti" as meaning, *inter alia,* "serving to prevent, cure, or alleviate" or "combating or defending against;"[4] the Product, containing ingredients that *cause* staining and white marks (even if to a lesser extent than other products), is

---

[4] https://www.merriam-webster.com/dictionary/anti

unquestionably *not* fairly or honestly characterized as "anti-yellow stains" or "anti-white marks."

49. Similarly, claims of "no white marks", and especially claims of "no yellow stains" are false in light of the fact that yellow staining is caused by Aluminum Zirconium Tetrachlorohydrex GLY, the active ingredient in the Product, and the Product, when used, clearly leaves "white marks" on clothing.

50. In fact, the only significant or consistent difference between the Product and the non-"Anti Marks Protection" Axe antiperspirants is that the active ingredient, Aluminum Zirconium Tetrachlorohydrex GLY, is diluted from 18.2% (in the non-"Anti Marks Protection" line) to 11.4% in the Product.

51. The mere dilution of an active ingredient causing a problem is not, in any sense of the phrase, "protection" from such problem.

52. Rather, the dilution of an active ingredient more likely simply reduces the effectiveness of the "normal" product, making the Product, in reality, inferior to the non-"Anti Marks Protection" line.

53. And that deceptive fact is in addition to the worse reality that the Product causes what it falsely claims to "protect [users]' shirts from."

54. Honest marketing and/or claims would include statements such as "less likely to cause staining versus regular formula" or "reduced stain causation versus normal formula"; Defendant's claims that the Product "protects your shirt from white marks and yellow stains," or contains "Anti Mark Protection" are patently false.

55. A normal consumer is unable to determine simply by reading the claims on the Product packaging and/or the Product's ingredient list that it actually contains no additional ingredients relative to Defendant's non-"Anti Marks Protection" product other than silica.

56. While the fact is extremely well-established, a normal consumer also is unaware that Aluminum Zirconium Tetrachlorohydrex GLY is a key factor (along with a person's perspiration) that

11

contributes to and, at least indirectly, *causes* the "yellow stains" and "white marks" the Product purports to provide "protection from."

57. In addition, a user is not able to test the Product on their clothing, which reveals that it unquestionably creates white marks, until after purchasing the Product.

58. Upon information and belief, Defendant Unilever profits from the wide-spread practice of selling a diluted version of its regular product for the same price as non-diluted versions.

59. Upon information and belief, it is cheaper for Unilever to produce the Product, a relatively-diluted version of its regular "Axe"-brand antiperspirant, than it is for Unilever to produce regular "Axe"-brand antiperspirant.

60. Upon information and belief, Defendant Unilever deceptively and misleadingly markets the Product as falsely providing "protection" from marks, and/or being "anti marks" to hide the fact from consumers that the Product is, in fact, inferior in its primary purpose, preventing perspiration, and is cheaper to produce.

61. Defendant's marketing and selling of the Product by use of the aforementioned false, deceptive, and misleading statements is illegal and prohibited under the MMPA.

*Allegations Relating Specifically to Claims of the Nationwide Class*

62. As noted, *supra,* since the initial offering of the Product, each and every container of the Product has borne a uniformly-worded label falsely claiming the Product causes and/or produces "No Yellow Stains" and "No White Marks" (hereinafter "False Claims").

63. In reality, testing of the Product reveals the falsity of the False Claims; not only does the Product readily leave white marks on multiple colors of clothing, when transferred to clothing from a user's body and mixed with perspiration, over time, the Product also creates yellow stains on clothing.

64. Defendant, as developer, manufacturer, and exclusive seller and distributor of the Product, has been aware since the Product's inception, that the False Claims are in fact false – that the

12

Electronically Filed - Jefferson - July 08, 2019 - 05:05 PM

Product leaves white marks and causes yellow stains.

65. Indeed, Defendant undoubtedly did its own testing of the Product prior to it being offered for sale and, of necessity, such testing would have made Defendant aware that the Product leaves white marks on clothing and causes yellow staining.

66. Despite this, Defendants purposely made the False Claims in order to induce the false belief in consumers that they were purchasing a product that caused no white marks or yellow stains on their clothing.

67. Plaintiff and the class members purchased the Product with no reason to suspect or know that the Product actually caused white marks and yellow stains.

68. Defendant possessed specialized knowledge regarding the data and information concerning the chemical formula of the Product and whether the Product would, in fact, cause yellow staining when combined with a user's perspiration.

69. In fact, in regard to the aspect of the False Claims relating to yellow staining, the Product is a credence good because its purported "no yellow stains" benefit cannot be independently assessed or verified by the consumer at the time of purchase.

70. In purchasing the Product, Plaintiff and the class members had no choice but to necessarily and justifiably rely upon the False Claims as accurate.

71. Had Plaintiffs known that the False Claims were false, Plaintiffs would not have purchased the Product or would not have paid as much for the Product.

72. As the direct and proximate result of the False Claims, Plaintiff and the class members have suffered economic injury by being deprived of the benefit of the bargain they were promised by Defendant.

73. By marketing, selling and distributing the Product to purchasers in Missouri and throughout the United States, Defendant made actionable statements that the Product would cause and/or

13

create and/or lead to "No White Marks" and "No Yellow Stains," and at all times failed to disclose that the Product did in fact cause and/or contribute to white marks and yellow stains.

74. Defendant engaged in the above-described actionable statements, omissions and concealments with knowledge that the representations were false and/or misleading, and with the intent that consumers rely upon such concealment, suppression and omissions.

75. Alternatively, Defendant was reckless in not knowing that the False Claims were false and misleading at the time they were made.

76. As the distributor, marketer, producer, manufacturer, and seller of the Product, Defendant possessed specialized knowledge regarding the data and information concerning the chemical formula of the Product which the Plaintiff and the class members could not and did not review.

77. All of Plaintiffs' claims are based on misleading statements that violate FDA regulations. Such claims do not seek to impose any additional or different obligations beyond those already required by such FDA regulations.

78. Further, Plaintiffs' claims arise, *inter alia,* from "front of the box" statements and symbols which are not regulated by the Nutrition Labeling and Education Act.

*Facts Particular to Dan Crepps and Representative of the Proposed Class and Subclass*

79. In or around June of 2019, after having viewed Defendant's statements regarding the Product on www.axe.com, and other websites as described *supra,* Plaintiff visited a retail outlet for Unilever products, particularly Walmart, 2201 Michigan Ave. Arnold, MO 63010.

80. While there, Plaintiff observed that the Product was being sold for the same price as Axe's non-"Anti Marks Protection" product.

81. Due to the claims on the packaging as well as the statements on www.axe.com, Plaintiff falsely believed he was purchasing a product that was equally effective as Axe's non-"Anti Marks Protection" product but having added benefit to, *inter alia,* allow it to "protect[]" his shirt from white

14

marks and yellow stains.

82. Plaintiff thereafter purchased the Product.

83. At the time he purchased the Product, Plaintiff was unaware of the falsity of the Product's claims and/or the falsity of Defendant's online claims regarding the Product and/or the falsity of the False Claims.

84. If Plaintiff had been aware of the falsity and misleading nature of Defendant's claims regarding the Product, he would not have bought the Product.

85. When Plaintiff purchased the Product, he was injured by Defendant's illegally deceptive, false, and misleading conduct in marketing and selling the Product.

86. Although the aforementioned facts apply to named Plaintiff, for purposes of the proposed Class and Subclass, all that is relevant is that Plaintiff and the class members, United States and Missouri citizens, purchased the Product at a time within the Class Period while in the United States and/or Missouri.

## CAUSES OF ACTION

### COUNTS RELATING TO THE NATIONWIDE CLASS

**COUNT ONE: BREACH OF WARRANTY**

87. Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this First Amended Petition.

88. Defendant sold the Product in its regular course of business. Plaintiff and the class members purchased the Product.

89. Defendant made promises and representations in an express warranty provided to all consumers, namely the False Claims -- that the Product would cause, create, and or lead to "no white marks" and "no yellow stains."

90. The False Claims became the basis of the bargain between the Defendant and Plaintiff

and each class member.

91.     Defendant gave these express warranties to Plaintiff and each class member in written form on the labels of the Product.

92.     Defendant's written affirmations of fact, promises, and/or descriptions as alleged are each a written warranty.

93.     Defendant breached the warranty because the False Claims were false – the Product in fact causes white marks and yellow stains.

94.     The False Claims were false when the sales took place and were undiscoverable to Plaintiff and the class members at the time of purchase.

95.     All conditions precedent to seeking liability under this claim for breach of express warranty have been performed by or on behalf of Plaintiff and the class in terms of paying for the Product. Defendant had actual notice of the false labeling information and to date has taken no action to remedy its breach of express and implied warranty.

96.     Defendant previously knew or should have known of the falsity of the False Claims on the Product due to, *inter alia,* Defendant's testing and use of the Product.

97.     Defendant has nonetheless refused to remedy such breaches.

98.     By placing the Product in the stream of commerce, and by operation of law and the facts alleged herein, Defendants also impliedly warrantied to Plaintiff and the class members that the Products were accurately labeled in conformance with the law.

99.     Defendant's breaches of warranty have caused Plaintiffs and class members to suffer injuries, paying for falsely labeled products, and entering into transactions they otherwise would not have entered into for the consideration paid. As a direct and proximate result of Defendant's breaches of warranty, Plaintiff and class members have suffered damages and continue to suffer damages, including economic damages in terms of the difference between the value of the product as promised and the value

of the product as delivered.

100. As a result of Defendant's breach of these warranties, Plaintiff and class members are entitled to legal and equitable relief including damages, costs, attorneys' fees, rescission, and/or other relied as deemed appropriate, in an amount sufficient to compensate them for not receiving the benefit of their bargain.

**COUNT TWO: BREACH OF IMPLIED CONTRACT (IN THE ALTERNATIVE)**

101. Plaintiff repeats and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

102. By operation of law, there existed an implied contract for the sale of the Product between Defendant and Plaintiff and each class member who purchased the Product.

103. By operation of law, there existed an implied duty of good faith and fair dealing in each such contract.

104. By the acts alleged herein, Defendant has violated that duty of good faith and fair dealing, thereby breaching the implied contract between Defendant and each class member.

105. As a result of that breach, Plaintiff and each class member suffered damages.

**COUNT THREE: UNJUST ENRICHMENT**

106. Plaintiffs repeat and reallege the allegations set forth in the preceding paragraphs as if fully set forth herein.

107. Plaintiffs plead their claim for relief in the alternative to the contract claims set forth above.

108. Plaintiff and the class members have conferred substantial benefits on Defendant by purchasing the Product, and Defendant has knowingly and willfully accepted and enjoyed those benefits.

109. Defendant either knew or should have known that the payments rendered by Plaintiff and the class members were given and received with the expectation that the Product would be as

Electronically Filed - Jefferson - July 08, 2019 - 05:05 PM

represented and warranted. For Defendant to retain the benefit of the payments under these circumstances is inequitable.

110. Through deliberate misrepresentations or omissions in connection with the advertising, marketing, promotion, and sale of the Products, including the False Claims, Defendant reaped benefits, which result in Defendant wrongfully receiving profits.

111. Equity demands disgorgement of Defendant's ill-gotten gains. Defendant will be unjustly enriched unless Defendant is ordered to disgorge those profits for the benefit of Plaintiff and the class members.

112. As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiffs and the class members are entitled to restitution from Defendant and institution of a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendant through this inequitable conduct.

**COUNTS RELATING TO THE MISSOURI SUBCLASS**

**<u>COUNT FOUR: VIOLATION OF THE MMPA – Misleading, False, and Deceptive Marketing</u>**

113. Plaintiff hereby incorporates by reference and re-alleges each allegation set forth in each preceding paragraph of this First Amended Petition, as though fully set forth herein.

114. Defendant's acts complained of herein occurred in and emanated from the State of Missouri.

115. Plaintiff and all members of the Missouri Subclass are "persons" and the Product is "merchandise" as those terms are defined under the MMPA.

116. As set out in this Petition, Defendant's marketing of the Product constitutes deception, false pretense, misrepresentation, unfair practice, or, at a minimum, the concealment, suppression, or omission of a material fact in violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. chap. 407 ("MMPA"), in particular, Defendant marketed the Product by falsely claiming, *inter alia,* it

18

Electronically Filed - Jefferson - July 08, 2019 - 05:05 PM

provides "anti marks protection" and that it would "protect" consumers' shirts from marks and yellow stains, conditions that it, in reality, the Product contributes to and/or causes.

117. As a result of Defendant's actions, consumers, including Plaintiff, were misled or deceived that the Product they were purchasing contained benefits it did not, in fact, have.

118. Defendant's deceptive acts caused Plaintiff and the Missouri Subclass Members an ascertainable loss within the meaning of the MMPA. In particular, Plaintiff and the Missouri Subclass paid for a Product that did not, in fact, contain any "anti mark protection" and did not, in fact, "protect" a user's shirt from the conditions claimed; nor did the Product live up to any of the False Claims on its packaging.

119. Due to Defendant's illegal conduct, Plaintiffs are entitled to restitution of all funds improperly obtained by Defendants.

120. In addition, Defendant's conduct as aforesaid was wanton, willful, outrageous, and in reckless indifference to the rights of Plaintiffs and others similarly situated and, therefore, warrants the imposition of punitive damages.

121. Plaintiffs have been forced to hire attorneys to enforce their rights under the MMPA.

**COUNT FIVE: INJUNCTIVE RELIEF**

122. Plaintiff hereby incorporates and adopts by reference each and every allegation set forth above.

123. Defendant continues to retain payment made by Plaintiff and other members of the Missouri Subclass for the Product that is the result of Defendant's deceptive and misleading marketing in violation of the MMPA.

124. Applicable law, including R.S. Mo. § 407.025, permits the Court to enter injunctive relief to prevent Defendant's continued violation of the law by continuing to make the False Claims, or by continuing to falsely state that the Product contains "anti marks protection" or that it "protects" user's

shirts from white marks and yellow staining.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an order certifying this action as a Nationwide class action, along with a Missouri subclass, and appointing Plaintiff Dan Crepps as Class and Subclass representative and his counsel as class counsel. Plaintiff requests that this court find that the Defendant is liable pursuant to the aforementioned nationwide claims; and/or violated the MMPA, and award Plaintiffs compensatory damages, restitution, attorneys' fees, punitive damages, costs, and such further relief as the Court deems just.

Respectfully submitted,

**DANIEL F. HARVATH, ESQ.**

By: /s/ *Daniel F. Harvath*
Daniel F. Harvath, #57599MO
**HARVATH LAW GROUP, LLC**
75 W. Lockwood, Suite #1
Webster Groves, MO 63119
(314) 550-3717
dharvath@harvathlawgroup.com
*Attorney for Plaintiff*

Electronically Filed - Jefferson - July 08, 2019 - 05:05 PM